CHANCERY.     Chisholm's Heirs *vs* Ben, Celia, &c. (per-sons of color.)

Case 108.                ERROR TO THE GREEN CIRCUIT.

*Wills.     Evidence.     Revocation of wills.*

July 19.     CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

Case stated.

THE County Court of Green county having rejected, as not sufficiently proved, a paper offered for probate as con-taining the substance of the will of Benjamin Chisholm, the case was taken by appeal, into the Circuit Court for the same county, where the judgment of the County Court was reversed, and a provision giving to Mrs. Chis-holm for her life, the tract of land on which Chisholm had lived, and also six slaves, Ben, Celia and others, and emancipating them at her death, was ordered to be recorded as the will of said Chisholm. To reverse this judgment the heirs of Chisholm prosecute this writ of error.

To prove a will not in existence, it must appear, 1st. That a valid will was made. 2d. The contents or such part as may be recorded.

No written will having been produced for probate, and none having been in existance at the death of Chisholm, it was incumbent on the party offering to prove by parol, the substance of his will, to establish: 1st, The fact that he had made a valid will. 2d, The contents or sub-stance of that will, or of such portion as might be re-

corded as his will; and, 3d, That the will, though not in existance at his death, had not been revoked by him.

I. Upon the first of these propositions, the proof, by two subscribing witnesses, that they, at the request of Chisholm, on different occasions, and each when the other was not present, subscribed a paper acknowledged by him to be his will, might be deemed sufficient to raise the presumption that the instrument had then the signature of the testator, were it not that the witnesses not only did not see the signature, but the circumstances tend to the inference that if there had been a signature at the bottom, it would have been seen; and as one of the subscribing witnesses says the will was read to him by Chisholm on the occasion when he subscribed, his failure to state that it had the name at the commencement or elsewhere, has some tendency also to repel that assumption. It is true, a female witness, whose character for truth as well as chastity, is impeached by several witnesses, and sustained by none, after having sworn in a deposition in reference to this alledged will, that she had heard Chisholm read no part of it, stated in her oral testimony in Court, that she had heard him read it all, and that it commenced in the usual way, "I, Benjamin Chisholm," &c. But we reject the testimony of this witness, as being discredited, not merely by bad character but by her own contradiction upon a material point affecting directly her evidence as to what was in the will, and by other circumstances not necessary to detail.

There is no other testimony bearing directly on the question of signature. But it appears that about two years before his death, which was probably after the subscription of the names of the two witnesses, Chisholm deposited with a friend, (Vancleave,) a sealed paper, which he said was his will, and to be preserved as such, and he repeatedly said, within the last two years of his life, that he had a will. The question, however, is not whether the instrument was in due form when it was deposited with Vancleave, which, however, is itself only matter of inference, but whether it had the signature of Chisholm when it was subscribed by the witnesses. By the letter of the statute, the signature is an essential re-

*Margin notes:*

CHISHOLM'S H's, vs BEN et al.

3. That though not existing at the testator's death, had not been revoked.

Evidence examined upon the due execution of the will.

'By the letter of the statute, the signature is an essential requisite of a will of land or slaves, and it must be complete by signature when attested, Swift vs Riley, (1 B. Monroe, 116.)

quisite of a will of land or slaves, and by its fair import, the instrument must be complete by signature at the time of attestation: *Swift* vs *Riley*, (1 *B. Monroe*, 116.) It is the due execution of the will that the witnesses are to attest, and by their subscription to authenticate. When the instrument produced is complete in form as a will, or if not being produced, it has been seen with the signature of the decedent, then the proof by the subscribing witnesses, that they subscribed upon his acknowledgement, though without seeing the signature, together with proof identifying the instrument subscribed as the one seen in perfect form, or in case of a lost will, the proof by the subscribing witnesses of acknowledgment alone, might be sufficient in the absence of countervailing circumstances, to prove the due execution of the will.

But although the mere fact of subscription by attesting witnesses, which is made essential by the statute as a means of authentication, might be deemed in itself, a sufficient ground in the absence of repellant circumstances, to authorize the presumption of all that was necessary to constitute a proper attestation and to justify the subscription as an act of authentication, it is a very different whether and how far other facts, such as the condition of the testator, as being childless or otherwise, his desire to accomplish a particular object by his will, his declarations and acts importing a belief that he had a will, facts to which the statute gives no importance, and which have only a general bearing upon the question of testacy or intestacy, should be entitled to any effect upon the specific question of due execution of the will, for the proof of which the statute intends to provide, by the attestation of subscribing witnesses. There being, in this case, circumstances attending the fact of subscription by the witnesses, such as the concealment of the place of signature from the first subscribing witness after the testator had professed to make him acquainted with the contents of the will, and the failure of the other to see the signature of the testator, when, if it had been there, he would probably have seen it, and when he did see the name of the first witness, which tends to overthrow the presumption that they attested the due execution of the will, and

to impair the effect of their subscription as proof of the fact; it is matter of great doubt involving a question of serious importance, whether the more general facts referred to, or any facts falling short of actual proof that the instrument was signed, can be brought in to supply the deficiency of the statutory evidence.

Is then the due execution of the will by the signature of the testator, which the statute requires to exist at the time of attestation by the witnesses, and which, in this case, they have not only failed to prove, but rather disprove, to be determined by inferences or by a comparison of probabilities, drawn from general facts of remote bearing, and which cannot possibly establish, with certainty, the existance of the signature at the time of attestation? Without attempting any peremptory solution of this important question, we will say that while in a clear case of spoliation, it might be allowable to solve all doubts and adopt every presumption against the spoliation, and while the fraudulent destruction of the certain means of proof which the instrument itself would afford of its own form and contents, might, to a considerable extent, supply the absence of other proof, it does not follow that the casual loss of a will should have the same effect in relaxing the rules of evidence, and much less that a will not produced, should be established upon doubtful inferences, as to its due execution and contents, if it be also doubtful whether it were revoked by the decedent or fraudulently destroyed by others. But conceding, (what is by no means certain,) that if the contents of the instrument now in question were satisfactorily proved, and if upon all the facts bearing upon the question of revocation, there was a reasonable certainty that the instrument never was revoked, and especially if there was a reasonable certainty that it had been fraudulently destroyed, the will should not be rejected solely on the doubt arising in the present case as to its due execution at the time of subscription by the witnesses; we cannot admit that there is such certainty on the question of due execution as would authorize any relaxation of proof on either of the other questions.   And we leave the proof on the ques-

CHISHOLM'S H's.
vs
BEN et al.

Evidence exam-
ined in regard to
the contents of
the will.

tion of due execution, as rather requiring aid from the
proof on the other questions than giving strength to it.

II. With regard to the contents of the will, there is, as
already stated, no witness who assumes to have ever read
a word of it, except the trifling bequest of the cupboard
and its ware, after the death of Mrs. Chisholm, which the
female witness before referred to says she read, and for
the establishment of which there seems to be no effort
nor care. The same witness says she heard Chisholm
read the will as he wrote it, in the presence of herself
and his wife, and undertakes to say that a draft of a com-
plete will, exhibited on the trial in the Circuit Court, con-
tains the provisions of the will as then read. It has alrea-
dy been stated that the same witness had previously sworn
that she had not heard Chisholm read any part of the will.
And besides this and other discrepancies between her
different statements, there are circumstances not neces-
sary to be now detailed, which render it improbable that
the will was, in fact, read to Mrs. Chisholm and the wit-
ness, as she says. We, therefore, lay her testimony out
of the case on the question of the contents, as we did on
the question of the execution of the will, with the remark
that the obvious attempt, by means of this witness, to
fabricate testimony of facts which she did not know, il-
lustrates the weakness of the case on the part of the pro-
pounders of the will, and the caution with which parol
testimony of the contents of a will should be received.

The only remaining witness who pretends to any knowl-
edge of the actual contents of the will, is the first sub-
scribing witness, who says Chisholm read or professed to
read it to him when he called on him to witness it. But
while this is represented as having been done by Chis-
holm, even without any request on the part of this wit-
ness, the second subscribing witness states that he asked
to know what was in the will, and was answered that it
was not necessary for him to know its contents, and they
were neither communicated to him, nor to the confiden-
tial friend who is said to have been named as executor,
and with whom the paper was deposited. Nor is there
any circumstance in the case which accounts for or ex-
plains this signal and exclusive confidence said to have

been reposed in this first subscribing witness, who appears to have been comparatively a young man, and although in the employ of Chisholm, is not shown to have held any peculiar place in his esteem, and whose character, although not overthrown by the testimony, is not above reproach. Nor are there wanting some discrepancies between his written and oral testimony, which tend to weaken his claims to absolute credence.

These considerations tend to throw some doubt even upon the statement of this witness, that Chisholm professed to read the will, or otherwise to communicate its contents to him; and when it is recollected that he would not allow the witness to read for himself, and even folded down or covered over the writing when the witness came to subscribe his name, it seems fairly inferable, that if Chisholm did profess to read the will to him, he did not really intend that he should know what it contained. But further than this, the witness states that Chisholm not only read but also talked of the contents of the will. He does not know that he read it all. He does not, in fact, know that he read any of it; and it is uncertain from his statement, what part he derived from the conversation and what part from the supposed reading of Chisholm.

Conceding then, that the evidence of this witness is worthy of full belief, is it sufficient to establish the contents of the will? Does he in fact know, or pretend to know what was in it? And does his testimony amount to any thing more than a detail of what Chisholm told him was in the will, or of what he supposed Chisholm was reading from the will? It is true, his statement that the will emancipated certain slaves, corresponds with the statement of other witnesses, that Chisholm had said to them that he intended to emancipate, and to some or all, that he had emancipated his slaves by will. But is not all this testimony of precisely the same grade and efficacy, all resting upon the mere statements or representations of Chisholm himself? And are these representations, if made to a hundred witnesses, and especially to witnesses who had no interest in the subject, and no right to require the information from him, sufficient of themselves to establish the contents of the will in the Court of Pro-

CHISHOLM'S H's.
*vs*
BEN *et al.*

bate.  If the due execution of the will is to be proved by the acknowledgment of the decedent, without an exhibition of his signature, that a certain paper is his will, and if the contents of the paper, in case of its absence, are to be proved by evidence of his own statements of what was in it, the statutory requisitions of writing, and signature, and attestation by subscribing witnesses, would seem to be of little value, since the whole proof of the will would in effect be made by evidence of the mere statements of the decedent himself.  There is little difference between setting up a lost or absent will upon the testimony of witnesses who say they subscribed a paper upon the acknowledgment of the decedent that it was his will, without seeing his signature, or reading or perhaps seeing what was written, with additional proof by themselves or others, that the decedent said his will contained such provisions, and setting it up on no other proof than that of divers credible witnesses, that they had heard the decedent say he had a will in his desk containing such and such devises.

The declarations of a decedent tending to show that his will was still in existence though rejected by the New York Courts to repel a presumption of revocation, are admitted in Ky. and elsewhere, though with caution, and only as corroborative, & regarded as the lowest species of evidece.

In the Courts of New York, declarations of a decedent, tending to show that his will once duly executed was still in existence, have been rejected as incompetent to repel the presumption of revocation : *Jackson* vs *Betts*, (6 *Cowan's Rep.* 382,) and cases there cited.  And although such declarations are freely admitted in this and many other Courts, upon the question of revocation, or upon the general question of testacy or intestacy, they are received with caution, and apparently as corroborative only, even upon that question, being as said by Sir John Nicholl, in *Johnston* vs *Johnston*, (1 *Eng. Ecclesiastical Reports*, 144,) in general the lowest species of evidence, though received as corroborative in the Ecclesiastical Courts.  Can such evidence then, be alone sufficient to establish in the Court of Probate, the contents of a will which the statute requires to be in writing?  The statute contemplating the exhibition and proof of the written will itself, makes no provision for proof of its contents in case of loss or destruction.  Under the various exigencies arising from casualty or fraud, a lower grade of evidence has been necessarily admitted, and there may

probably be circumstances which would authorize the establishment of a will upon the mere weight of probability as to its execution and contents. But we are not prepared to admit that every point in the question of probate may be left to that determination. There must be reasonable certainty somewhere. And although in case of the non-production of the will, under circumstances which raise no presumption of unfairness on the part of those who would establish it, there must be a departure from the strict rule of evidence requiring the contents of a writing to be proved by itself, still the spirit of the statute, and the preservation of those barriers which it intends to erect against the fraudulent imposition of mere parol wills, as well as the fraudulent suppression of valid wills in writing, seem to determine in case of the mere loss of a will against the sufficiency of parol evidence of its contents, not derived from an inspection of the written will by the witness, or from its actual operation as allowed by those who are interested against it, and may be presumed to have had actual knowledge of its contents. These considerations disallow in the case supposed the sufficiency of the testator's mere declarations, either as to his general intentions, or as to the particular import or effect of his will. And if such declarations and other general circumstances more or less remote from the particular fact be allowed in case of fraudulent suppression of the will, to be sufficient proof of its contents, the same considerations seem to require that the fact of fraudulent suppression which is to authorize such extraordinary relaxation of the rules of evidence, should itself be established beyond reasonable doubt.

The books of reports contain many cases in which wills lost or destroyed, have been offered for probate upon parol or other secondary evidence of their contents, and many in which such wills were established. But in an examination of these cases as extensively as opportunity would allow, we have found none in which there does not seem to have been the evidence of witnesses who knew, or might be presumed to have known the contents of the will, from their own inspection; none in which the declarations or even professed reading of the decedent

The contents of a lost will have never been established in cases where there was not a fraudulent destruction of the will, unless the witness had read the will and in that way had a knowledge of its contents. Can other proof be admitted in cases where the

Chisholm's H's.
vs
Ben et al.

fraud is of doubt-
ful inference ?—
Qur.

have been held to be alone sufficient on this point, and none which would sanction their admission upon the question of the contents of the will, with any other effect than as merely corroborative of the more direct evidence. The cases of *Trevelyan* vs *Trevelyan*, (1 *Eng. Ecc. Rep.* 64;) *Davis* vs *Davis*, (2 *Ib.* 277;) *the case of Harper's will*, (4 *Bibb*, 244;) *Beauchamp's will*, (4 *Monroe*, 362;) *Payne's will*, (4 *Monroe*, 424;) *Baker* vs *Dobyns*, (4 *Dana*, 220;) *Allison* vs *Allison*, (7 *Dana*, 90;) *Beall* vs *Cunningham*, (3 *B. Monroe*, 390;) *Campbell* vs *West*, (3 *Ib.* 242;) *and Steele* vs *Price*, (5 *Ib.* 58,) and others have been examined, and although some of them indicate a strong presumption of fraud in the suppression of the will, not one of them seems to have been determined on such evidence of the contents of the will as is now in question. But in the case of *Steele* vs *Price*, (5 *B. Monroe*, 58,) which was the case of a will casually lost by the testator, the devise of the slaves as established, was expressly restricted to include those only whose names were stated by the witnesses from an inspection of the will.

If the fraudulent destruction of a will for the purpose of producing intestacy, is to have the effect of authorizing a departure from the rule thus intimated in *Steele* vs *Price*, and of throwing open the proof of the execution and contents of the will, or of its contents alone, to every description of evidence which may be calculated to raise an inference, and is to authorize the establishment of what, upon comparison of inferences, may be supposed to have been the probable contents of the will, we repeat, the fact which is to authorize such a relaxation must itself, be placed beyond reasonable doubt. If there be not some stringency in the rule of proof, at least upon this point, if a doubtful inference of fraud is to authorize the establishment of a will by proof of the parol declarations of the testator, it may be made easier to prove an absent will than one which is actually produced; and an inducement and opportunity may be offered for setting up spurious wills, the prevention of which is no less the object of the statute and of the law, than is the frustration of the fraud which would suppress a valid will.

III. Under the most liberal view then, of the law applicable to the proof of a will not in existence at the death of the supposed testator, the sufficiency of the evidence in this case, depends upon the effect of the proof relied on by the propounders of the will, to show satisfactorily, that it has not been revoked, but was fraudulently destroyed to prevent its taking effect as a will, and to the consideration of this point we now proceed.

The fact that the will was destroyed before the death of the testator, is sufficiently established, and no presumption arises in this case, that it was done by those who are now endeavoring to establish it. The effort on their part is to show that it was secretly and fraudulently destroyed by Mrs. Chisholm, who seems to have obtained it by a message in the name of her husband, to the person with whom it was deposited; and they attempt further to show that at the time when it was thus procured, and from that time until his death, he was in such a condition of mind as rendered him incompetent to revoke his will, even if it was destroyed with his knowledge or subsequent approbation, which they deny. That there is evidence conducing to prove all these facts, is not to be denied, although there is no direct testimony as to the circumstances immediately attending the destruction of the will, and the evidence of Chisholm's incompetency does not show it to have been continual. But giving to it the utmost reasonable effect, proves it to have been occasional only, with intervals not clearly defined by the evidence. On the other side, two visiting physicians prove that they saw him, two or three times, during the period referred to, when though lethargic, he was entirely rational when aroused by conversation; one of them thinks he was insane only with reference to his own health or disease. Other witnesses prove his participation in business transactions within this period, under circumstances that leave no doubt as to his competency. And while the sale of one of the slaves said to have been emancipated by the will, which constituted one of these transactions, proves conclusively a change of intention, and was a revocation as to that slave, several witnesses prove his declarations at several periods approaching within a few weeks of the

Margin notes:

CHISHOLM'S H's.
vs
BEN et al.

Evidence examined as to the fraudulent destruction of the will and revocation by the testator—difficult to say that the preponderance is not in favor of the conclusion that the will was revoked.

Chisholm's H's.
.vs
Ben et al.

time of his death, importing that he had destroyed his will and would die without one. Then although there appears at one time, about or near two years before his death, to have been some dissatisfaction on the part of Mrs. Chisholm, and a short separation between herself and husband in consequence of his having made or intended to make a will emancipating his slaves, there is no proof of the slightest contest or dispute between them after their reconciliation, which must have been long before the commencement of his sickness and alledged incompetency. And as her dissatisfaction seems to have arisen rather from his emancipation of one or two slaves which she claimed, than of his freeing the others, the presumption may be indulged that that matter was settled to their mutual satisfaction. Be this as it may, the will as established, gives to her for her life, the entire tract of land and all the slaves; and as this seems to place her in a much more favorable condition than if her husband had died intestate, she had no apparent motive of self interest, prompting her to the fraudulent destruction of her husband's will, if its substance has been truly proved. Nor is there any thing in her conduct, so far as proved, in relation to sending for the will or destroying it, that can authorize the inference that in destroying the will she acted without the authority of her husband or in opposition to his wish. She mentioned to a physician by his bedside, that he had made a will and wanted to send for and destroy it, and consulted him as to the propriety of doing it. That this conversation was in an under tone on her part, was not strange, but if she had formed the design of fraudulently destroying the will, it would have been strange that she should mention the subject to an indifferent and respectable individual, and especially by the bedside of her husband, and without requesting secrecy. Then the other physician states that Chisholm subsequently told him that he had made his will and left it with Mr. Vancleave, but had sent for and destroyed it, (or possibly that he would do so,) and leave the law to dispose of his estate. Another witness also proves his statement that he had destroyed his will. And if these witnesses do not misrepresent the statements and condi-

tion of Chisholm, the destruction of the will was, in effect, his own act, done for the purpose of revocation. The witness who went for the will and delivered it to Mrs. Chisholm, says nothing in his testimony from which it should be inferred that there was any thing done against or without the consent of Chisholm. His different statements to the various witnesses, most of which he denies or explains, and the making of which would seem to be inconsistent with the secrecy and fraud imputed to the transaction, if they serve to impair his credit, do not establish any fraudulent act. And it is to be observed that his character for veracity, is sustained by several witnesses, and indeed by all who speak on the subject. There is also evidence of declarations by Chisholm, indicating that he supposed he had a will some short time before his death. But the witnesses who speak of them, generally make the impression that he may not then have been perfectly clear in his mental faculties. While the witnesses detailing the opposite declarations, make a different impression as to his mental condition at the time. We will not, however, pursue this branch of the subject, upon which it might have been sufficient, at once, to say that the evidence does not establish satisfactorily, the fraudulent or improper destruction of the will, and that it would be difficult to say that the preponderance is not in favor of a revocation by the decedent.

It follows, that in our opinion, the evidence on the whole case, is insufficient to establish any provision of the supposed will, as the valid will of Benjamin Chisholm ; and as we perceive no error in the trial to the prejudice of the propounders of the will, no new trial is necessary, but we proceed to pronounce finally in the case.

Wherefore, the judgment of the Green Circuit Court, reversing that of the Green County Court, and ordering to record as the will of Benjamin Chisholm, the devise of his land and slaves as stated in said judgment, is reversed, and the cause is remanded with directions to affirm the judgment of said County Court.

*Morehead & Reed* for plaintiffs ; *Robertson & McKee and Harlan & Craddock* for defendants.