## Pritchard et al. v. Harvey et al.

(Decided Feb. 11, 1938.)

S. H. RICE and CHARLES L. SEALE, and RICHARD P. DIETZ-MAN for appellants.

ROSE & STAMPER for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

Robert Pritchard died on March 24, 1936, at the age of 65 years and a resident of Island City, a village in Owsley county, Ky. For many years he had conducted a retail store in that place and at the time of his death he had accumulated property, both real and personal, the aggregate value of which was, perhaps, between $25,000 and $30,000. He was married four times, the last wife being the appellant, Laura Pritchard, whom he married in 1920. He had no children as a result of either marriage, except a daughter, the appellant Elsie Pritchard, a child by his second wife; but that marriage was dissolved in a divorce proceeding, and the wife, with her infant child, moved to the state of Missouri after the granting of the divorce, where the daughter grew to womanhood and obtained a clerical position with a business firm in the city of St. Louis, her mother dying in 1935.

At the time of Robert Pritchard's death Elsie Pritchard had never seen her step-mother, nor had she ever been in Island City, where her father had been living for the past 18 or more years. However, about 12 years before her father's death, the latter met his daughter in the city of St. Louis, and still later there was a meeting between them in Belleview, Ill. Following those two meetings, with some years intervening, the daughter met her father in the city of Louisville, Ky., pursuant to his written request for her to do so, and they were together some 16 hours during that

meeting. Still later the father was confined in a hospital in Louisville with some ailment and at his request his daughter again visited him, and that was the last time she ever saw him alive. Following the time of the meeting in Belleview, Ill., and at the request of the father, a correspondence grew up between the two, but, instead of the daughter's letters to her father being addressed to him at Island City, where he lived and where there was a post office, she addressed them to her aunt (her father's sister and an active appellee herein), Mrs. Lucy Harvey, who lived near Booneville, the county seat of Owsley county, and in the envelope so addressed to Mrs. Harvey there was enclosed the one written by the daughter to her father and which the aunt would deliver to him. Likewise, following a peculiar notion of the father, he would procure Mrs. Harvey, his sister, to mail the letters he wrote to his daughter from the Booneville post office instead of Island City.

In November, 1935, preceding the death of Robert Pritchard, which occurred in March, 1936, he wrote a letter to his daughter, the original of which became lost, but the contents were proven, in which he told her that he intended visiting her in the following December and said that he had some matters and things that he wished to talk over with her, but in a later letter he stated that he was unable to make the contemplated December visit and postponed it to a future indefinite time. He also told her in one of those letters that he had accumulated enough property to take care of himself and her the rest of their lives, and that he wanted her to come down and assist him in carrying on his business, and that when they met he would talk over matters with her in more detail. He, however, grew more feeble and never met her pursuant to his expressed contemplation. However, he did write her a last and final letter on January 2, 1936, 5 weeks before he took to his bed, and 2 months and 22 days before he died, which the daughter preserved, and it, omitting date, address and signature, was and is in these words: ''A few lines to you as i got your letter & glad to hear from you. Hope by the time you get this letter you will Bee much better & getten a long Fine. I wanted to come & See you So Bad But I am Just all most Past Gettin a

Round any. I havent Felt good for a long Time But was in hopes i could Seen you. But sure could not Get a Round any I can walk in the House & Kinly Get a Round. But i hope to get to Fealin Better I am expecten to See you later & then I'l tell you what i want to tell you. But i am Plannen Just like i told you Some time Back. Say Take the Best of care of your Self & try & get well & all rite a gain. So Keep up Courage & Plan for the Better Later. So you write me & tell Me how you are a long & take the Best of care of your Self. By By.''

The only information that the daughter had of the last and fatal illness of her father was a letter written to her by her aunt Lucy Harvey, whose husband is Bent Harvey. In that letter the aunt wrote that Mr. Pritchard could not live but 2 or 3 days and informed his daughter that her father ''has lots of stuff and a big store and we want you. You know what I told you here before. She (meaning Pritchard's wife) can only hold a child's part and she or him has no child. Dont tell anyone who you are to cause her to raise a racket with him. We will stand by you,'' etc. The daughter did not receive that letter in time to prepare for and make the trip until after her father's death, but she did not on that occasion go to his home in Island City—the burial being at a place considerably removed therefrom.

About 10 years before the decedent's death he procured one Frye, a notary public, to write for him a will, the contents of which are not disclosed in this record. However, he placed it in a glass fruit jar and sealed it and delivered it to his sister, Lucy Harvey, who buried it in her husband's stable, on the farm where they resided. It was kept there until some time later, when it was concluded that its encasement in the ground might destroy it, and it was then delivered to the decedent. That is the last occasion that any one living, so far as this record discloses, ever saw it. On October 11, 1935, the decedent went to the office of Rose & Stamper, attorneys in Beattyville, Ky., for the purpose of having them write his will. They did so pursuant to his instructions, and it was executed and witnessed in their office as the law requires—the attorneys preserving in their office safe a carbon copy of it. The original was placed in one of their envelopes with the firm name

printed on the upper left-hand corner and the envelope sealed. It was then delivered to Mr. Pritchard, who took it away, and no one but him ever saw it or its contents thereafter, so far as this record discloses.

Following the death of Mr. Pritchard, his widow applied to the county court of Owsley county and moved that she be appointed administratrix of his estate on the theory, of course, that he had left no will; but Mrs. Harvey, and perhaps others of his collateral kindred, possessed some knowledge with reference to the Frye will and objected to the appointment of any one as administrator of the estate until it was thoroughly ascertained that Mr. Pritchard died intestate. Thereupon the county court appointed the sheriff of the county and one of his deputies, together with two other persons, to search his small safe that he kept in his store, the combination of which was known only by Mrs. Harvey. It was made, and no will of any kind was found in the safe, nor anywhere else. In the meantime Mr. Stamper, of the firm of Rose & Stamper, met Mr. Seale, who was the widow's attorney, and informed him of the will of date October 11, 1935, telling him all of the facts surrounding its execution and of the existence of the carbon copy in the office of the attorneys. Thereupon the collateral kindred of the decedent appeared in the county court and moved to probate that carbon copy as the last will and testament of the decedent. Following that, they filed their equity petition in the Owsley circuit court pursuant to the provisions of section 4861 of our Statutes to establish the alleged lost will of the decedent, some of the collateral kindred being nonresidents. The county court, at the hearing of the motion to probate the carbon copy referred to as the will of Mr. Pritchard, overruled it and dismissed the application, from which an appeal was prosecuted by the collateral kindred of the decedent to the Owsley circuit court, and that appeal was consolidated with the equity action, referred to, and the consolidated action was tried by the court as an equity one without the intervention of a jury. It, on final submission, sustained the prayer of the petition in the equity action and reversed the judgment of the Owsley county court and ordered the carbon copy to be probated as the last will and testament of the deceased. From that judgment the widow and dece-

dent's daughter, who are the appellants, prosecute this appeal.

Both sides agree as to the correct rule of law governing a case like this one. As reiterated by Chief Justice Dietzman in the case of Ferguson v. Billups, 244 Ky. 85, 50 S. W. (2d) 35, it is: "In order to establish a lost will, it is essential to prove [a] the due execution, [b] contents, and [c] continued existence of the will unrevoked by the testator. Chisholm's Heirs v. Ben, 7 B. Mon. 408; Baltzell v. Ates, 181 Ky. 413, 415, 205 S. W. 548; Wood v. Wood, 241 Ky. 506, 44 S. W. (2d) 539. Each of the essential elements of such a case must be proven by clear and convincing evidence. Bradshaw v. Butler, 125 Ky. 162, 100 S. W. 837, 30 Ky. Law Rep. 1249." After discussing the first two essentials (execution and contents), the learned Chief Justice came to consider the third essential, i. e., the "continued existence of the will unrevoked by the testator," and which was done under subdivision 2 of the opinion. He then said: "Notwithstanding the satisfactory proof as to the execution and contents of the will, there is a further exacting condition to be met by the propounders. It must be shown that the will was maintained in existence and not revoked by the maker. The fact that the will was last seen in the custody of the testator, and was not found after his death in its accustomed place, constituted a cogent circumstance tending to prove its revocation. Indeed, the failure to find a will last seen in the control of the testator raises a presumption that it was destroyed by him for the purpose of revoking it. Mercer v. Mercer's Adm'r, 87 Ky. 21, 7 S. W. 307, 9 Ky. Law Rep. 870; Webster v. Lowe, 107 Ky. 293, 53 S. W. 1030, 21 Ky. Law Rep. 998; Baltzell v. Ates, 181 Ky. 413, 415, 205 S. W. 548, 549."

The cited cases in those excerpts completely sustain it, and the required requisites as so enunciated were again approved by us in the very late case of Madden et al. v. Sevier et al., 271 Ky. 688, 109 S. W. (2d) 41, (decided January 28, 1938). A comparison of the facts existing in the Wood Case, supra, with those found in this record, justify the statement that they are substantially or completely parallel the one with the other. But we denied the probate of the offered copy in that case solely upon the ground that the

necessary essentials, supra, were not proven "by clear and convincing evidence," including the one of nonrevocation by the testator in the circumstances outlined in the opinions referred to, i. e., where the will in contest was in the possession of the testator before his death but could not be found after that time.

In the Wood Case, just as in this one, the essential of·clear and convincing proof of nonrevocation was attempted to be established by declarations of the deceased made before his death, but, while admitting such declarations to be competent, we further held in that opinion that they were insufficient, standing alone, to overcome the presumption of revocation under facts creating the presumption, and which are indisputably proven in this case. The language we employed in that (Wood) opinion upon that specific phase of the case was: "The declarations of the deceased tending to corroborate or to confirm other evidence of the main fact are admissible in evidence, but such declarations alone are not sufficient to establish any one of the ingredients essential to constitute a case for the admission of a lost will to probate."

In this case no living person, under the proof, knew the combination of the decedent's safe save and except his sister, Lucy Harvey—and, perhaps, her husband who may have obtained that information from his wife, since it is indisputably proven, and denied by no one, that the only two persons possessing knowledge of the combination to the safe before the decedent's death were himself and his sister, Lucy, to whom he had imparted it. The widow, according to the undisputed proof, never knew it and never opened the safe, since the peculiar characteristics of her husband forbid her from doing so. We therefore have this situation—that the testator's lost will was executed and delivered to him on October 11, 1935. He was up and about and able to attend to his affairs after that date until February 11, 1936, a period of four months and one day. During that time he wrote letters to his daughter, which, in view of his taciturn and reticent—as well as secretive—disposition, displayed affection for her, his only child. In one of those letters he expressed deep concern about her physical health, and in another he assured her that he had acquired enough property to take care of both of

them the rest of their lives. Such expressed sentiments were at variance with the contents of the alleged lost will, in which the daughter and only child got but little more than an equal division with her uncles and aunts of her father's estate. There is, therefore, a reasonable implication to be drawn, to the effect that upon reconsideration, Mr. Pritchard concluded that he had not done justice, either to his widow or to his daughter, in the provisions of the will executed by him on October 11, 1935, and presumptively knowing that the law would appropriate his property, first to the extent of the payment of his debts, then an allotment. to the widow of only a reasonable amount of his estate as provided by statute, and that the rest of it would go to his only child, he, having complete control of his will, destroyed it in a manner to work its revocation.

Under the undisputed facts contained in the record the burden was on the propounders (appellees here) to overcome, by clear and convincing proof, the presumption of revocation arising from those facts, even in the absence of the implication supporting that presumption to which we have referred. In an effort to discharge that burden they introduced testimony to prove declarations of the decedent alleged to have been made by him between the date of the execution of his last will (October 11, 1935) and the time of his death, which counsel insist creates a strong inference that his will was still unrevoked. Two of the witnesses testifying to such declarations (Mrs. Harvey and her husband) were clearly incompetent witnesses to prove such facts. The husband, because he was testifying for his wife, a devisee under her brother's will, and the wife because her testimony was not directed to the mental capacity of her brother, nor to undue influence exercised upon him. See Hale v. Hale, 242 Ky. 810, 47 S. W. (2d) 706. Neither was Mrs. Harvey a competent witness to prove the declarations referred to on the ground that she could testify for the other devisees under the will in contest, and which was so declared by us in the case of Brewer's Ex'r v. Smith, 242 Ky. 175, 45 S. W. (2d) 1036. Therefore, all of the declarations testified to by Lucy Harvey and her husband, Bent Harvey, become eliminated from the case, even if their substance tended to prove the principal fact, but which is exceedingly doubtful.

There were, however, two other witnesses who testified to such alleged declarations, and they were Ance Carmichael, who married Bent Harvey's niece, and Dorman Harvey, the son of Lucy Harvey and her husband, and who, of course, was a nephew of decedent. Carmichael's conversation with the decedent was heard in December, 1935. As given by Carmichael, his conversation was: "Well, he and I was sitting out on the porch one evening, and we raised the talk about John Daugherty's estate; I asked him what Crit Gentry was doing back here, and he said 'They are lawing over John Daugherty's estate, and he said 'Say, Henry, a man ought to have his business fixed up better than that,' he said, 'I have got my business fixed just the way I want it.' "

The nephew testified that his uncle was on a short visit to his parents' residence about the 20th of November, 1935, and while there engaged in a conversation with his mother (Lucy Harvey), and witness was asked to tell the conversation, and he answered: "Well, he said he had the papers fixed up all right." Thereupon the court asked him: "Q. Did he say what papers?" The witness answered: "No, he didn't." The examination then continues: "Did he say where the papers were fixed up, or who fixed them up? A. No. Q. Did he say at which place it had been done? A. No, he didn't. Q. How long was your uncle Robert at your home? A. Five or ten minutes."

He was then asked the subject matter of the conversation between his mother and his uncle, to which he answered that he did not remember, since he had forgotten all about it. He was then urged by another question to tell what he did remember of the conversation, to which he answered: "Well he said he had the papers fixed up, and asked her how she was getting along and everything, and that is about all I remember." If that conversation did occur and the uncle of witness had "fixed up" the indefinitely referred to "papers," his affairs were in better condition than the testimony of the witness, since that does not seem to have been "fixed up" so as to prove anything. Moreover, the conversations or declarations as given occurred about 10 weeks before the decedent became so ill as to cease work and to take to his bed, which was ample

time for him to reconsider what he had done in the execution of his will and to exercise his right of revocation in undoing it; and which observation also applies to the testimony of the witness Carmichael.

Bent Harvey was present when the first examination of the contents of decedent's safe was made. He testified that in making that examination he saw an envelope composing a part of the contents of the safe with the name of Rose & Stamper printed upon its left-hand upper corner, but that at his request it was not opened because at that time he was unaware of the execution of the will of October 11, 1935, and was looking for the prior Frye will. He is overwhelmed in that statement by a number of circumstances in the case, and also by the testimony of the other witnesses who were present, including the two officers above referred to. They testified that no such envelope was in the safe at the time of that search, nor did Bent Harvey make any such remark as he testified to. On the contrary, all of them said that everything in the safe was examined and no will of any date or tenor was found. Besides, he, as we have seen, was an incompetent witness.

Another circumstance relied on to overcome the presumption of revocation is that a witness testified that he was present at a second opening of the safe and that he observed some finger prints made on the dust that had collected on the inside of its door, but who made them, or when they were made, if at all, neither he nor any one else knew. They could have easily been made by some one during the first examination, which, of course, was after the decedent's death. The inference sought to be drawn from that testimony is that some interested and prowling person had gained entrance into the safe and had filched therefrom the testator's will sought to be probated in this case. But over and above the recited weakness of that testimony there were witnesses present who said that the finger prints were not found on the inside of the safe as testified to by appellant's witness, but only on its top where dust was deposited.

Another fact attempted to be proven, which is strongly relied on as overcoming the presumption of

revocation, and as meeting the requirements of the law supra, was the discovery of a check in the safe, on its second examination, bearing date after the death of the testator, which, if true, would show that some one had been in it after its first examination, since no such later dated check was found in it at that time. However, the inference therefrom was totally destroyed by the one who issued the check. He produced his stub book from which the check had been detached, and it clearly showed that the check for the identical amount and for the identical purpose was issued in February, 1935, instead of April, and that it was a clear mistake on his part when the check was dated as having been issued in April of that year instead of February, when it was actually given. Moreover, the different alleged declarations of the decedent, supra, are totally at war with a most persistently emphasized fact throughout the brief for appellee (and which is supported by the record) of extremely guarded secretiveness as a prominent characteristic of him throughout his life, and especially that which he showed in connection with the execution of his will.

Over and beyond what we have said up to this point, it also should be remembered: That no one knew the combination of the safe by which it might be opened (without force) except the decedent and his sister, Mrs. Harvey. The widow was not pecuniarily interested in the least in the destruction of her husband's will, since she had been informed that she had the right to renounce it and to obtain her distributive share of his estate as provided by law the same as if no will had been executed. The daughter, at the times the searches were made for the will, had never met her stepmother, decedent's surviving widow. Hence they were total strangers; nor was the daughter ever in her father's store, or even in the village where he resided, until after the searches had been completed. The nearest she was ever to that place was when her father was buried at a place some considerable distance from his residence and his store, in which latter place the safe was situated. She also was unacquainted with the combination whereby it might be opened. Clearly, therefore, no suspicion could rest on her as being the one who abstracted the will from the safe after her father's death,

if it was done. With equal emphasis, it may be said that the widow, even if she had been able to do so, was entirely disinterested in the matter, since the law furnished her ample means whereby she could disregard the will.

Further discussion of the testimony, and a pointing out of many circumstances thereby proven, would strengthen the conclusion we have reached if it were necessary to do so; but what we have already stated concerning the condition of the proof heard at the trial clearly demonstrates to our minds that appellees failed to overcome the presumption of revocation by the required proof necessary therefor, and, having concluded, it would serve no useful purpose to so unnecessarily lengthen this opinion by making further comments or engaging in further discussion of the testimony.

Wherefore the judgment is reversed, with directions to set it aside, and to enter one dismissing the equity petition filed by appellees in the Owsley circuit court, and also dismissing the appeal they prosecuted from the judgment of the Owsley county court overruling their motion to probate the carbon copy of the will offered therein by them as containing the contents of the lost will and testament of Robert Pritchard, and for other orders or proceedings not inconsistent with this opinion.