## Ledford v. Hubbard.

(Decided December 10, 1926.)

(Rehearing Denied with Modification March 25, 1927.)

### Appeal from Clay Circuit Court.

1. Elections.—Nominee for sheriff, if failing to properly file certificate of nomination within time required by Ky. Stats., section 1456, held validly nominated by certificate of chairman of Republican county committee acting under section 1464.

2. Elections.—Ky. Stats., section 1453, contemplates that signature on nominating petition be either personal signature or one made by another in presence of person whose name was signed.

3. Signatures.—Where person's name is signed for him, at his direction and in his presence by another, signature becomes his own and is sufficient to give same validity to instrument as though written by himself.

4. Elections.—In election contest, burden is on party claiming nomination under petition to show due execution of such petition.

5. Elections.—One who sought to get his name on ballot by complying with Ky. Stats., section 1453, originally had burden to show compliance with such statute, since one claiming compliance with statute must prove that he did so.

6. Evidence.—Defendant who makes affirmative defense has burden with respect thereto.

7. Elections.—In election contest where evidence showed that signatures on nominating petition were not written by signers themselves, person claiming nomination under such petition had burden to show that they were written for signers in their presence and by their direction.

8. Evidence.—Where party who has not general burden of proof possesses positive and complete knowledge concerning existence of facts which party having burden is called on to negative, or where for any reason evidence to prove facts is chiefly within his control, he has burden to produce evidence.

9. Signatures.—Signature consists both of act of writing party's name and intention of thereby finally authenticating instrument.

10. Elections.—Where voter's signature to nominating petition was written by himself, such fact raises presumption that he intended to authenticate instrument, and it is unnecessary to offer proof of such intention.

11. Elections.—Where party's name is not written on nominating petition by party himself, proof must be adduced to show that it was his intention to authenticate instrument.

12. Elections.—There is presumption that each signature upon nominating petition was written there by alleged voter himself.

13. Signatures.—To make valid the signature of party's name by another under parol authority, he must know what is being done through operation of some of his senses, and not through trust or confidence in party doing writing.

14. Elections.—Signatures on nominating petition for sheriff, not made by alleged voters themselves nor in their presence, will be stricken.

15. Elections.—Where name of voter appears in two places on nominating petition, one will be stricken.

16. Elections.—Signature of person living outside county will be stricken from nominating petition for sheriff.

17. Elections.—Wife's name written on nominating petition for Sheriff by husband without her knowledge will be stricken.

18. Elections.—Where there is no proof to show when or where name was written on nominating petition for sheriff and name was not written by voter personally, it will be stricken.

19. Elections.—Signature on nominating petition for sheriff, not written by voter himself nor in his presence or at his direction, will be stricken.

20. Elections.—Evidence held insufficient to show that signature on nominating petition for sheriff was written in presence and by authority of voter, where husband went into house, obtained consent, and returned and reported to person who wrote signature.

21. Elections.—Signature of person who was unable to read or write found on nominating petition for sheriff will be stricken, where it was not shown that name was written in presence and by authority of such person.

22. Elections.—Evidence held insufficient to show that name of voter was signed to nominating petition for sheriff in his presence and at his request, in view of his positive denial.

23. Elections.—Signature will be stricken from nominating petition for sheriff, where all the evidence shows there is no such person.

24. Elections.—Clerk held without authority to put on ballot name of candidate for sheriff whose nominating petition contained less than 100 valid signatures due to disregard of Ky. Stats., section 1453.

25. Elections.—Votes for one whose name was placed on ballot, notwithstanding insufficient number of signatures on nominating petition, cannot be counted, and candidate who had majority without counting such votes was elected, unless he violated Corrupt Practice Act (Ky. Stats., section 1565b-1 et seq.) or there was such fraud that court was unable to say who received majority of legal votes.

JOHN M. QUINN for appellant.

ROY W. HOUSE and WILLIAM LEWIS for appellee.

OPINION OF THE COURT·BY DRURY, COMMISSIONER—Reversing.

The appellee, Millard Hubbard, was found by the election commissioners of Clay county to have 'been elected sheriff at the election held November 3, 1925. Ledford, who was the regular Republican nominee, contested Hubbard's election. Burchell, who was the regular Democratic nominee, also contested Hubbard's election, and contested the right of Ledford to participate in that election, or to maintain his contest against Hubbard. He made the election commissioners of Clay county parties to his contest, and they are appellees here. The two cases were tried together. The trial court found in favor of Hubbard, and from that finding Ledford has prosecuted this appeal, and has brought up 17 volumes of record. Hubbard has also prosecuted an appeal from that judgment, and has brought up 11 volumes of record

made in his case. At the primary election of August 1, 1925, there were 6 different candidates for the Republican nomination for the office of sheriff of Clay county. More than 100 candidates were seeking nominations at that primary. This primary election followed a very heated campaign. Ledford received the certificate of nomination. There seems to have been but little interest taken in the Democratic campaign, and Burchell received the certificate as nominee of the Democratic party for that office.

Following this primary, there was much dissatisfaction and talk of an independent ticket. Those disgruntled at first contemplated the nomination of T. C. McDaniels as an independent candidate for sheriff. A petition for McDaniels was prepared, but before it was filed his friends became aware of the fact that, as he had been a candidate in the August primary, he could not be a candidate upon an independent ticket at the November election. Their attention was called to this on the 15th of September. The next morning, September 16, a petition was prepared and circulated by this same element, requesting the clerk of the Clay county court to print upon the ballot for the November election the name of Millard Hubbard as an independent candidate for the office of sheriff. The petition was prepared and signed in great haste. It is claimed by Ledford, the regular Republican nominee, and Burchell, the regular Democratic nominee, that this petition was defective and insufficient, because it did not state the age of Hubbard, how long he had been a resident of Clay county, failed to designate any emblem, and did not contain the picture of any emblem under which it was proposed that his name should be placed on the ballot; that it was not signed by 100 legal voters of Clay county; that a page of signatures to the McDaniels petition was taken from that petition and inserted in the Hubbard petition; that the Hubbard petition, after it was filed, was then withdrawn, and further signatures thereto procured; and there were other defects alleged, but this is enough for our purpose.

Besides questioning the right of Hubbard to have his name placed on the ballot, Ledford filed other grounds of contest, so numerous that we shall not undertake to detail them, further than to say that the petition and exhibits make up 135 pages of the record. The answer and counterclaim filed by Hubbard is just about as volumin-

ous, there being over 100 pages of it, alleging a little bit of everything; but the chief thing relied on is that Ledford failed to file his nomination certificate within the time required by section 1456 of the statutes. Thus at the very threshold of this case we find Ledford and Hubbard struggling, each endeavoring to maintain his own position on the ballot and to thrust off his adversary. The facts about that appear to be that after the August primary, the election commissioners made duplicate certificates of nomination; that one certificate was mailed to each of the successful candidates, and the duplicate thereof was delivered to George S. Jones, clerk of the Clay county court, with directions to indorse them "filed," and that Jones agreed to do so. Ledford was in the county clerk's office shortly thereafter, and asked the clerk if there was anything else he had to do, and the clerk told him "no," except to file his expense account before the final election. About the 20th of September, the rumor was started that all the Republican candidates who were nominated at the August primary, except one, had failed to file their certificates of nomination, and had lost their rights to have their names printed on the official ballot. It is agreed that on October 3, 1925, the executive committee of the Republican party held a meeting in Manchester, that a quorum was present, and at that meeting that executive committee indorsed and nominated the Republican nominees of the August primary. Ledford took his certificate from the Republican executive committee to the county clerk, and asked him to file it, and have his name placed upon the ballot. The county clerk refused to receive this certificate, or to file it, and thereupon Ledford began a suit in the Clay circuit court, the result of which was that the clerk was compelled by that court to do so. As a further precaution, Ledford, on October 31, although his name was then printed on the ballot as the Republican nominee for sheriff, procured from the chairman of the Republican county committee a nomination as such candidate, as permitted under section 1464 of the statutes. So far as the attack upon Ledford's right to have his name on the ballot is concerned, that is settled by our opinion delivered on October 22, 1926, in the case of Baker v. Marcum, 216 Ky. 210, 287 S. W. 696, which was appealed from this county and involved practically the same questions. See, also, Schnabel v. Sutton, 213 Ky. 116, 280 S. W. 488.

We shall now consider Hubbard's right to have his name on the ballot. Hubbard contends that his nominating petition was signed by 134 legal voters. Ledford contends, and asks us to adjudge, there were only 122 names on it, and that of these very few really signed it. As to how many signatures there were to Hubbard's petition, there is sharp conflict on the testimony. Several reputable men testified that there were 134 names, while others equally reputable testified that there were only 122. This petition cannot be found; but we have before us an officially certified copy of the signatures to this petition, made by the county clerk at a time when it was a public record in his office, and that fixes the number at 122. It is claimed that one whole page of signatures to the McDaniels petition was taken from it and inserted in the Hubbard petition. Evidence shows that the fourth page in Hubbard's petition was of a different kind of paper from the rest of Hubbard's petition, of different length and had pin holes in it, as though it had been in another parcel; that it was of the same kind of paper as the rest of the McDaniels petition; that it had a peculiar blurred line made by the typewriter without question made at the same time and by the same typewriter as that shown on the fifth page of the McDaniels petition, and had been folded in the same manner as McDaniels' petition, and unlike remainder of Hubbard's petition.

Ledford is also asking us to strike from Hubbard's nominating petition those names that were written upon the page claimed to have been taken from McDaniels' petition and inserted in Hubbard's petition.

It will not be necessary for us to strike the 12 names, being signatures 123 to 134 inclusive, which are referred to in this record as the "added names," nor will it be necessary for us to strike the names alleged to have been taken from the McDaniels petition, which are referred to in this record as the "McDaniels petitioners." We are persuaded from the proof that Ledford is probably correct in both of these contentions. Without doing either of these things, we find that Hubbard has not the requisite number of legal signatures to his petition. In the case of Morgan v. Revis, 215 Ky. 30, 284 S. W. 111, we said: "The statute contemplated either a personal signature or one made by another in the presence of the person whose name was signed." It requires neither more nor less formality to make a signature to such a petition as this, than it does to make a signature to a deed,

a contract, or a will. It has long been the settled rule in this and other jurisdictions that where a person's name is signed for him, at his direction, and in his presence, by another, the signature becomes his own, and is sufficient to give the same validity to an instrument as though written by the person himself. W. J. Fell Co. v. Ellswick, 194 Ky. 641, 240 S. W. 373; Irvine v. Thompson, 7 Ky. (4 Bibb) 295; 36 Cyc. 451, 13 C. J. 307, sec. 130, 40 Cyc. 1103; Savage v. Bulger, 76 S. W. 361, 25 Ky. L. R. 763, 77 S. W. 717, 25 Ky. L. R. 1269; Upchurch v. Upchurch, 55 Ky. (16 B. Mon.) 102; Middlesboro Water Wks. v. Neal, et al., 105 Ky. 586, 49 S. W. 428, 20 Ky. L. R. 1403; 27 C. J. 287, section 356. See, also, the more than fourscore of cases from England and states of this union cited in the case of Pearce v. Dekle, et al., reported in Ann. Cas. 1912D 1355, and the notes following. This rule is based upon the familiar maxim, *qui facit per alium facit per se.* When a subscriber's name is written for him by another in his presence and by his parol authority, the act is deemed to be his as much as if he had done it in person, and the person actually writing the name is regarded, not as an agent, but as a mere instrument or amanuensis. See authorities cited under note 18, page 287 of 27 C. J.

A large number of the signatures of this Hubbard petition were not written by the alleged voters themselves. In many instances, it is shown that these signatures were not written in the presence of the alleged voters, and without such voters' knowledge, but in many instances the proof merely shows that the signature was not written by the voter, and then stops, so that before we take up this petition and the signatures to it, it will be necessary for us to consider and determine upon whom rests the burden of proof relative to signatures to this petition. Ordinarily, in a suit upon a written instrument, where the defense is *non est factum*, the burden is on the party claiming under the instrument to establish its due execution. See Denny v. Darraugh, 212 Ky. 655, 279 S. W. 1069; Darraugh v. Denny, 196 Ky. 614, 245 S. W. 152; Thompson v. Eversole, 162 Ky. 836, 173 S. W. 165. This action is in the nature of an action upon this petition the due execution of which by the alleged signers thereto is put in issue, and although the alleged signers are not parties to this action, yet the rule is the same, and it would appear that the burden should be on

the party, claiming under the instrument, to show its due execution.

Hubbard sought to get his name on the ballot by complying with section 1453 of our statutes. Originally the burden to show compliance with this statute rested upon Hubbard. A man who claims that he complied with a statute must prove that he did so. Com. v. Reed Phosphate Co., 113 Ky. 32, 67 S. W. 45; Orme v. Com., 55 S. W. 195, 21 Ky. L. R. 1412; Haskell v. Com., 42 Ky. (3 B. Mon.) 342. A defendant who makes an affirmative defense has the burden with respect thereto. See O'Toole v. Sham, 2 Ky. Opin. 333; Brown v. Farmler, 3 Ky. Opin. 46; Robinson v. Hamilton, 6 Ky. Opin. 419. If the introduction into this record of this petition with a number of signatures attached was sufficient to shift to Ledford the burden of producing evidence to show they were not valid signatures, after evidence was introduced that many of these signatures were not written by the alleged signers themselves, then certainly, there was shifted to Hubbard the necessity of showing by evidence that these signatures that were not written by the alleged signers themselves were written for them in their presence and by their direction.

"In the administration of justice it is often wise to place the burden of producing evidence on the party best able to sustain it, and ambiguity, concealment, or evasion react with peculiar force on a pleader who asserts a fact and fails to produce the evidence, which if his assertion were true, would be in his possession. Hence it is very generally held that where the party who has not the general burden of proof possesses positive and complete knowledge concerning the existence of facts which the party having that burden is called upon to negative, or where for any reason the evidence to prove a fact is chiefly, if not entirely, within his control, the burden rests on him to produce the evidence." See 22 C. J. page 81. Also Stevenson v. Yates, 183 Ky. 196, 208 S. W. 820; Northwestern Mutual Life Ins. Co. v. Calloway, 18 Ky. L. R. 744, 38 S. W. 430; Funk v. Proctor, 110 Ky. 290, 61 S. W. 286, 22 Ky. L. R. 1728; Sun Life Ins. Co. of A. v. Bevan, 19 Ky. L. R. 1246, 43 S. W. 427.

Justice Bronson of New York in Wilson v. Betts, 4th Denio, page 201, said this of a signature:

"In the ordinary affairs of men, it is very often assumed without proof that he whose name has been

affixed to a written instrument, placed it there himself. But when the signing becomes a matter of legal controversy, it must be established by proof."

In his work on Evidence, section 674, Mr. Greenleaf says:

"A signature consists both of the act of writing the party's name and of the intention of thereby finally authenticating the instrument."

This section has been quoted in Vines v. Clingfost, 21 Ark. 312; 7th St. C. M. E. Church v. Campbell, 48 La. Ann. 1546, 21 So. 184; Davis v. Saunders, 40 S. C. 510, 19 S. E. 138; Watson v. Pipes, 32 Miss. 466; Lee v. Vaughn Seed Store, 101 Ark. 68, 141 S. W. 496, 37 L. R. A. (N. S.) 352. Practically the same thing is said in 27 C. J. 287, sections 356 and 357.

In the case of 2nd National Bank of Ashland v. Rouse, et al., 142 Ky. 612, 134 S. W. 1121, we had a similar question before us. S. G. Preston sold to J. B. Preston certain timber for $400.00 and took his note therefor, in which note there was written the following: "For all the timber on 486 acres of land on George's creek, from 18 inches at the ground up, and the privilege to remove it." Across the bank of this note, S. G. Preston wrote his name and sold the note to the 2nd National Bank of Ashland. The question in the case was, did this note thus indorsed become such a written memorandum of the sale of this timber as to comply with our statute of frauds? This court in that opinion seems to take notice that a signature consists both of the act of writing the party's name and of the intention of authenticating the instrument, for this court, in that opinion, said:

"It was not intended to evidence the contract of sale, was not to be held by the purchaser as a protection to him or to guarantee to him any rights, and when indorsed by S. G. Preston it was not his intention, in indorsing it, to give it validity as a contract representing the sale of this timber."

In Southerland v. Munsey, 119 Va. 791, 89 S. E. 882, it was held that names written in the body of an agreement and in the beginning for the purpose of identification, and not authentication, do not constitute a signature within the requirements of the statute of frauds. From what we have been able to find there seems to be

no authority to dispute Mr. Greenleaf's statement that a signature consists of two things, first, the writing of the party's name, and second, the intention of authenticating the instrument. A man's act in signing his name to an instrument carries with it the presumption that he intends thereby to authenticate the instrument and thus when it is shown that a voter's signature was written by himself, that mere fact raises the presumption that he intended to authenticate the instrument and it is not necessary to offer proof of his intention so to do. In other words, an unquestioned autograph is self-probative. However, when a party's name is not written by the party, himself, but by some one else, proof must be adduced to show that it was the intention of the party to authenticate the instrument. A signature written by the hand of another is on a parity with the signature made by a rubber stamp, and of such a signature, the Supreme Court of North Carolina, in the case of Mayers v. Mc-Rimmon, 140 N. C. 640, 53 S. E. 477, 111 Am. St. 879, said:

> "On the trial below the plaintiff presented the drafts, and each appears to have the name of the drawee stamped on the back with a rubber stamp. Where the name required has been so placed by one having authority to do it and with intent to indorse the instrument the authorities hold that this is a valid indorsement. 4 Am. & Eng. Ency. of Law, 2d ed. 258; Horner v. Missouri Pac. R. Co., 70 Mo. App. 285. The indorsement, however, does not prove itself, but must be established, as in other cases, by proper testimony."

Originally, the presumption was that each signature upon this petition was written there by the alleged voter himself. If the burden of overcoming that presumption by proof rested upon Ledford, and persisted until he produced proof that this name was not written by the voter in person, then the burden shifted to Hubbard to show by proof that the signature was written in the presence of the voter and by his authority, and thus establish the intention of the voter to authenticate the instrument.

We shall now note what has been said by various courts about when a signature is written in the presence of a party. In Kime v. Brooks, 31 N. C. 218, the alleged obligor on a note by reason of age and infirmity, could not write. His daughter was accustomed to write his

name for him. In this case when the note was presented to the obligor he laid the paper on a table and directed his daughter to sign his name to it. He then turned away and went out of the house into the yard. At the time she wrote his name, she did not see him and did not believe he could see her; but she could hear him talking. The court held the signature invalid, and in that opinion said:

"There can be no rule but one that he must be in such a situation as to know what is done, and be able at the instant to control the agent."

If when a testator made his will, he could not have seen the attesting witnesses sign on account of an obstruction to the view, and by reason of his enfeebled condition, he could not have placed himself in a position to see them sign, the attestation was not good. See Gordon v. Gilmer, 80 S. E. 1007, 141 Ga. 347.

This court rejected a codicil because the witnesses did not sign in the same room with the testatrix, though she could hear everything that was going on in the adjoining room, but could not see what was going on. McKee v. McKee's Exr., 155 Ky. 738, 160 S. W. 261. In the case of Jones v. Tuck, 48 N. C. 202, it was held that a will was not attested in the presence of the testator when the attesting witnesses signed in an adjoining room, though the testator might have seen them by changing his position, but did not do so. In Thompson on Real Property, section 3644 he says: "The fact of the execution of the deed by the hand of another under the immediate direction of the grantor and in his presence must be affirmatively shown by the party relying upon the deed." In Reynolds v. Reynolds, 1 Speers, 253, 40 Am. Dec. 599, the court of S. C. held that the expression, "in the presence of the testator," means within the observance of his senses. It would seem from these authorities, reasonable to hold that a signature is made in the presence of a party when he can see the signature written. The party writing the signature is regarded as an instrument in the hands of the signer and not as an agent for the signer, and whenever through the absence of the party whose name is being signed the one actually doing the writing ceases to be an instrumentality and becomes an agent, then the signature is not good. To make valid the signature of a party's name by another, under parol authority, he must know what is being done through the operation

of some of his senses and not through trust or confidence in the party doing the writing. When he ceases to know what is being done, through some of his senses, and only knows through trust and confidence, in the writer, what is being done, then instrumentality is at an end and agency is at hand, and the signature is void, where his authority is parol.

In the light of these authorities, we have stricken the following signatures, and for our own convenience, we have either preceded or followed each signature by a number, showing its position on this petition: (23) James Hays, (24) Henry Hays, (32) Dona Hacker, (33) Jack Runions, (34) Sarah Runions, (35) Lloyd Hornsby, (37) Dan Hacker, (38) Sarah Hacker, (39) Henry Hacker, (40) Mary Hacker, (41) Pearl Hacker, (42) Joe Gabbard, (43) Mary Gabbard, (44) Lydia Gabbard, (48) Alice Pennington, (72) Cora Owens, (82) Zena Herd.

None of these signatures was written in the presence of the alleged subscribers, and Hubbard so admits.

The name of R. M. Dezarn is signature (74) and also (103). He had a right to sign this petition at one place, but not more than once. Therefore, we have stricken signature (103).

Signature (12) is Mrs. Jeff Robinson. This signature was not written by this voter, but was written by some one out of her presence and without her knowledge. Later, she signed the petition herself, and this is signature (92). We have therefore stricken (12).

We have stricken the name of Maggie Stone (64), because the proof shows she is not a resident of Clay county.

We have stricken the name of Eli Hays, which was signature (22). This name was signed to this petition by Elizabeth Hays, the wife of Eli Hays, and she was asked if her husband knew she was signing his name to the petition and she said that he did not. R. P. Hatton was present at the time she signed this name, and he was asked if he saw Eli Hays and he said he saw him the next day, so it is clear that Eli Hays was not present at the time this name was signed.

The name of Molly Samples, which was signature (131), must be stricken because that name was signed to this petition by her husband, D. B. Samples. There is no evidence to show whether she even knew of its being signed to the petition, much less that she had authorized it. R. P. Hatton says in his testimony that D. B.

Samples came to him and asked if his wife's name was on this petition, and he told him it was not. He said that his wife wanted her name on it and he signed it. Her name must be stricken.

The name of U. S. Lewis appears as signature (133), and that must be stricken because the proof shows that name was written by R. P. Hatton, and there is no proof to show when or where it was done.

The name of Charlie Hollin (87) must be stricken because it was not written there by Charlie Hollin himself, nor was it done in his presence or at his direction.

The name of Rebecca Hubbard appears as signature (88). The evidence is that this signature was written by Ford Robinson, and there is no evidence to show that it was done in the presence of the voter or by her authority. The same is true of Betty Fields (89), and of Joe Fields (90), so we have stricken these.

The names of Belle Hicks, which is signature (50), and Molly Johnson, which is signature (51), are signed to this petition by R. P. Hatton, and Hubbard failed to show that these signatures were written there, in the presence and by the authority of these voters. The proof on that subject is this: Belle Hicks is the wife, and Molly Johnson is the mother-in-law, of John Hicks. Hatton rode up to John Hick's front gate and called him out and told him about the petition that he was circulating, and asked him if he would sign it. He consented to do so, and Hatton wrote John Hicks' name on the petition. Hicks testifies to going into the house and asking his wife and his mother-in-law about signing this petition and they said, "All right," and he so reported to Hatton. This was not sufficient and these names must be stricken.

Mr. Hubbard, in his brief, says:

"R. P. Hatton testified that he showed Nancy Bowling the Hubbard petition, and that she read it, and said she had rather not sign it until she had seen her husband, Lige. This witness says that the next day her husband, Lige Bowling, came to him in Manchester, Kentucky, and said his wife wanted her name on the Hubbard petition, and that he did too, and that he then signed both of their names to the petition. This was done in the presence of the husband, Lige Bowling. This witness says that, later on, he saw Nancy Bowling, and that she told him that she authorized her name signed to the petition."

From this it is evident that the signature of Nancy Bowling (119) was not attached to this petition in her presence, and therefore it is stricken.

The evidence discloses that R. P. Treadway, whose signature is (15), is unable to read and write. It appears that his name was signed to the petition by J. L. Treadway, but J. L. Treadway was not introduced, nor was any one else introduced to show that this name was written in the presence and by the authority of R. P. Treadway. We have, therefore, stricken his name.

Signature (18) is that of Peter Gambrel. He is described by the witness Hatton as being the same man as R. P. Gambrel. Hatton testified that at the direction and in the presence of R. P. Gambrel and Alice Gambrel, he signed their names to this petition, but R. P. Gambrel was introduced as a witness, and he says that Hatton came to his house and took dinner there, but the petition was never mentioned. Hubbard failed to show by a preponderance of the proof that these names were signed in the presence of these voters, and at their request. After reading the evidence of R. P. Gambrel, in which he states positively that he did not sign this petition, and the petition was not mentioned, we are convinced that Hubbard has not sustained this burden, and we have, therefore, stricken the names of R. P. Gambrel and Alice Gambrel.

We have stricken the name of Alex Hornsby, which was signature (36), because this signature was written upon this petition by William D. Hacker, and there is nowhere in the evidence even an intimation that Hornsby was present or authorized the signature to be made.

The name of Alex Goins is signature (86), and that name was signed by D. B. Samples. Hubbard failed to show that this signature was made in the presence of Goins, and by his authority. Goins, when introduced as a witness, and asked if he told Samples he could sign his name to the petition, said: "I told him I didn't care." Further on he explained that by that he meant he did not care whether he signed it or did not sign it, but he said further that Samples did not then have the petition with him, hence he could not have signed it in the presence of the voter, and, therefore, this name must be stricken. Samples was not introduced as a witness to dispute this, if, indeed, he could have disputed it.

Signature (121) is that of Farmer Hoskins. It is admitted that this man's name was signed to this petition

by R. P. Hatton. Hubbard failed to show that this name was written upon this petition by the consent of and in the presence of Hoskins. The most that appears is that Hatton says he was authorized to sign this name, and that he did sign it, but he does not say he signed it in the presence of Hoskins, and the testimony of Hoskins would indicate that he did not. His name should be stricken.

We have stricken the signature of Arry Campbell, which is (27). All the evidence shows there is no such person as Arry Campbell. There is some claim that this signature was that of Amy Campbell. If that is true, then it is a duplicate of signature (54). There is some evidence that this is the signature of Annie Campbell, but she was not introduced, nor was any one else introduced to establish that there was such a person.

The name of J. B. Goins is signature (134), and the evidence of that witness is rather illuminating, for he says that he thinks he signed this petition in October, which is in harmony with the record, for the record shows that, on September 21, Burchell had the clerk make for him a copy of the signatures to this petition, and that copy only contained 122 signatures, and the evidence of Mr. Goins accounts for what we are sure is a fact, and that is that 12 signatures were added to this petition after that date, of which the signature of Mr. Goins was one.

There is no need to go any further. If everything Hubbard says about this petition is true, if it had 134 signatures, and if none of these signatures was taken from the McDaniels petition, still his petition is now reduced to less than 100, and we have yet a number of names that are seriously questioned, and about which much evidence has been taken. Hubbard's petition now being reduced to less than the required number of signers, it follows that the clerk had no authority to put his name upon the ballot and that a vote for him was a vote thrown away. See Whitney v. Skinner, 194 Ky. 804, 241 S. W. 350; Justice v. Justice, 184 Ky. 130, 211 S. W. 419. The promoters of Mr. Hubbard's candidacy seemed to have absolutely lost sight of section 1453 of our statutes. They would let anybody sign this petition that would sign it, and he might sign all the names he wanted to. They never questioned his authority or the propriety of his action. For instance, one of them signed 13 names of parties, none of whom was present; another signed 17, of whom some were present and others not; another

signed some 8 or 10; and out of the whole 134, if there are that many, we have counted over 60 names that were signed by parties other than the so-called signers themselves, often without semblance of authority. Many signers gave no post office address; many of them omitted to give their residence; many of them gave incorrectly their post office addresses and residence. We are going to call attention to the evidence about one of these signatures. It is that of Robin Hollin. His name was signed to this petition. It is admitted he did not sign it personally. One witness says Ford Robinson wrote the name of Robin Hollin; Berlin Samples, in his testimony, claims he wrote Hollin's name; and R. P. Hatton in his testimony claims to have written this name on the petition. Three different men are claimed to have written this one signature. Two of these are necessarily untrue. Hollin himself did not testify. We feel these parties are trying to tell this just as it happened, but the whole thing was done so hurriedly and irregularly they are unable to know just what really occurred. Out of over 4,000 pages of such evidence, it is very hard to discover the truth.

The returns made by the election officers showed that Hubbard received 2,152 votes, Ledford 2,108 votes and Burchell 325 votes. The ballot boxes were opened and the vote was recounted by commissioners appointed by the court, with the result that Hubbard gained 2 votes and Ledford gained 34, thus bringing Hubbard's vote up to 2,154 and Ledford's up to 2,142. The court found that 57 votes that were cast for Hubbard were cast openly upon the table, and that 81 votes were cast openly upon the table for Ledford, thus reducing the vote for Hubbard to 2,097 and the vote for Ledford to 2,061. For the reason that his name was never rightfully placed on the ballot, the 2,097 votes for Hubbard cannot be counted. Thus Hubbard was not elected, and Ledford was, unless he was guilty of violation of the Corrupt Practice Act (Ky. Stats., section 1565b-1, et seq.) or there was such fraud, bribery, etc., that this court is unable to say who received a majority of the legal votes. This feature of the case was considered and disposed of in the case of Burchell v. Hubbard, etc., 218 Ky. 344, 291 S. W. 751 this day decided.

The judgment is reversed, and Ledford is adjudged to have been elected. The whole court sitting.

DISSENTING OPINION BY CHIEF JUSTICE CLAY.

This is not a case where the sufficiency of the nominating petition was questioned before the election. On the contrary, the case is one where the petition was not only adjudged sufficient by the clerk, but Hubbard's name was placed on the ballot and he received more votes than Ledford. That being true, the burden was clearly on Ledford to show that the votes cast for Hubbard should not be counted because Hubbard's name was not properly on the ballot. To say the least, the rule that a candidate who does not question the right of his opponent to go on the ballot before the election may contest his election on the ground that his name was improperly on the ballot, and his votes should not be counted, though settled by the decisions of this court, is so harsh in its effect that no presumptions should be indulged in, but the defeated candidate should show by clear evidence that his opponent's name was not properly on the ballot. This Ledford sought to do by showing that Hubbard's petition did not contain the requisite number of names. In a sufficient number of instances to affect the result Ledford merely showed that the names of certain petitioners were not signed by them. Under our law a petitioner's name may be subscribed by himself or by someone else in his presence and at his request. The burden being on Ledford it was necessary for him to establish both propositions. Merely showing that the names of certain petitioners were not signed by them was not sufficient, for, notwithstanding this fact, their names may have been signed by others in their presence and at their request. Instead of holding that proof that the names of certain petitioners were not written by the petitioners themselves was sufficient to cast the burden on Hubbard to show that their names were written by others in their presence and at their request, the court should have held that Ledford failed to meet the burden, and his claim that the petition did not contain the requisite number of signers should have been rejected. Having done this the court should have proceeded to try the other grounds of contest on their merits.

For the reasons given I am impelled to dissent from the majority opinion. I am authorized to say that Judges Rees and Logan concur in this dissent.