# Conley v. Coburn et al.
# Sexton et al. v. Conley et al.

Feb. 18, 1944

Edward L. Allen for Susie Coburn Sexton.

H. H. Smith and Joe Hobson for Mima Coburn Conley.

J. D. Bond and Clark Pratt for Sarah Coburn.

Napier & Napier for other appellants and appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

The case was resolved into the testing of the validity of two deeds purported to have been made by A. J. Coburn, deceased, one for 140 acres to his daughter and the other for 50 acres to his wife. The court decided the daughter's deed to be forged and the mother's to be valid. We have two appeals by the losing parties.

On the appeal of the daughter, Mrs. Mima Conley, it is contended that the judgment is not supported by the pleadings or the evidence. We first dispose of the questions of the sufficiency of the pleadings.

The litigation was precipitated by the widow, Mrs. Sarah Coburn, filling a suit against the six daughters of her deceased husband by a former marriage and their

respective husbands to quiet her title to the 50-acre tract. (a) The daughter, Mrs. Mima Conley, and her husband responded with an answer, counterclaim and cross-petition challenging the widow's title and alleging that she, Mrs. Conley, owned 140 acres, the boundary of which conflicted, in part, with the widow's claimed 50 acres. She set up a deed from her father to the 140 acres and prayed that she be adjudged the owner of the tract. The cross-petition was against her five sisters and their husbands. (b) Mrs. Susie Sexton and her four sisters and their husbands responded to the petition by an answer and counterclaim also challenging the widow's title and charging that her deed had been obtained by fraud and duress and made when the grantor was mentally incapable of executing a deed. They also claimed that the six daughters had title to a one-fifth interest in the land by inheritance from their mother, and that the father's title to four-fifths had been as trustee for their mother. They prayed that the widow's deed be cancelled and they be adjudged the owner of the property. (c) Mrs. Sexton and her sisters also filed a pleading, designated as a reply to the answer of Mrs. Conley and as a cross-petition against her. This pleading, with an amendment, set up several alternative allegations of fact but primarily charged the deed claimed by Mrs. Conley to be a forgery. The widow filed a reply to the answer and counterclaim of Mima Conley traversing its allegations and attacking her claimed deed upon several grounds, one of which was that it was a forgery. No attempt was made in this pleading to question the certificate of acknowledgment but by an amendment filed a few days later it was directly charged that the certificate itself was forged.

Mima Conley saved the legal points now insisted upon by demurrers and motions to strike from the pleadings of her adversaries and, when they were overruled, joined issue by rejoinders.

1. The pleadings are numerous and voluminous. The foregoing statement has stripped them to the essentials for getting at the points raised on the appeal. Those questions are that the court was not authorized to cancel Mrs. Conley's deed as a forgery because it was sought to be done in replies, and not by petition, and because the five sisters never attacked the certificate of acknowledgment.

It is certain that a judgment may not be rendered upon a cause of action asserted by a reply. Section 98, Civil Code of Practice; Connecticut Fire Ins. Co. v. Baker, 287 Ky. 395, 153 S. W. (2d) 938, 939. Of course, the parties and court may treat a reply as an amended petition. Hodge Tobacco Company v. Sexton, 166 Ky. 219, 179 S. W. 36. But the pleadings in this case attacking the deed are more than replies. In this particular, the pleading of the five sisters is a counterclaim asserted against Mrs. Conley in response to her cross-petition against them in which she had set up her deed and asked that she be adjudged to have title to the land by virtue thereof. Moreover, the sisters' pleading is a cross-petition against her. This is specifically authorized by Section 95 of the Civil Code of Practice. A counterclaim is itself the pleading of a cause of action in favor of a defendant against a plaintiff which arises out of transactions stated in the petition as the foundation of the plaintiff's claim or connected with the subject of the action. Section 96, Civil Code of Practice. The widow's pleading in response to Mrs. Conley's counterclaim against her is denominated merely as a reply. We do not understand that where a party asserts an affirmative defense which would defeat a plaintiff he may not avoid that defense by questioning its validity. Section 98, Civil Code of Practice. Compare Toppass v. Perkins' Adm'x, 268 Ky. 186, 104 S. W. (2d) 423.

The difficulty here is, in part, confusing nomenclature. More and more, courts are trying cases rather than testing names and regarding the technicalties of pleadings. All parties here could understand what each was aiming at. When there has been a trial upon the merits of a case, the court is slow to reverse the judgment upon a technical view of the pleadings. Rounds & Jesse v. Cloverport Foundry & Machine Co., 159 Ky. 414, 167 S. W. 384, Ann. Cas. 1915D, 40. While the widow's pleading on this branch of the case is primarily defensive, the sisters' pleading is direct and offensive. Not being purely personal, there is no reason why the widow should be deprived of its benefit, although under the circumstances it was not necessary that she should. Her defense, if not defeated, would prevent the daughter recovering the overlap, and the sisters' pleading if sustained would deprive her of the title she claimed. We

are of opinion, therefore, the pleadings are proper and sufficient.

2. We first consider the merits of the attack made upon the deed to the daughter, Mrs. Conley, as it bears an earlier date than the widow's deed. As we have stated, the issue is whether that instrument was forged. It is not questioned that one may adopt a cross-mark as his signature or direct another to sign his name for him. Such a signature becomes his own and is sufficient to give the same validity to an instrument as though written by the person himself, there being no statute to the contrary. Pardue v. Webb, 253 Ky. 838, 70 S. W. (2d) 665; Love v. Gibbs, 273 Ky. 775, 117 S. W. (2d) 987. Ordinarily the burden of proving such a signature is upon the one who alleges it. Commonwealth v. Campbell, 45 S. W. 89, 20, Ky. Law Rep. 54; Ledford v. Hubbard, 219 Ky. 9, 292 S. W. 345. But because of the official certification it was necessary for those attacking the deed to Mrs. Conley to establish that her father did not make the mark as his signature or authorize anyone to sign his name to it. A genuine officer's certificate imports absolute verity to the instrument. Kentucky Statutes, Sec. 3760; KRS 61.060; Morgan County National Bank v. Grace, 249 Ky. 461, 61 S. W. (2d) 10; Christopher's Adm'r v. Miniard, 267 Ky. 484, 102 S. W. (2d) 978; Atkins' Guardian v. McCoy, 275 Ky. 117, 120 S. W. (2d) 1019. If it is shown to be a forgery then the way is open to attack the genuineness of the grantor's signature; otherwise it is not. Atkins' Guardian v. McCoy, supra. This certificate being in proper form, it is prima facie evidence of the true execution of the deed. Smith v. Ferguson, 187 Ky. 338, 219 S. W. 160. The signature being "by mark," with all the wide-open possibilities which that character of signature affords, especially since the person is dead, the mere proof that the certificate of acknowledgment is false and a forgery is as a matter of weighing evidence in and of itself sufficient to establish the fact that the grantor did not execute the instrument. The evidence as to both the execution by the purported grantor and the notary's certificate is so interwoven it cannot well be separated or considered independently. Indeed, it need not be, for, as indicated, under the peculiar circumstances the court may well conclude falsus in uno, falsus in omnibus.

Andrew Coburn was 85 years old when he died February 24, 1940. He was illiterate and could not write his name. He had been an active merchant and business man and accumulated quite a large estate. He and his wife, whom he married in December, 1928, his six children and her several children by a former marriage appear to have been friendly throughout the years. They lived together or nearby. He had confidence in his son-in-law, Willis Conley, who assisted him in managing his financial affairs. The bank had been instructed to pay no checks except those signed or witnessed by Conley. In December, 1939, Coburn had Conley draw a check for his entire bank balance in favor of his wife, Mrs. Sarah Coburn, and at the same time he executed a deed to her of the home place of 50 acres. All of the family knew about these two transactions, but none raised any objection until after Coburn's death. Some of them then asserted the claim that he was mentally incapable of making the deed to his wife. It was after his death also that the Conleys first claimed that back in 1928 the father had conveyed to Mrs. Conley the 140-acre tract, which included the 50 acres he conveyed to his wife shortly before he died.

Willis Conley's testimony concerning the transaction with the deceased is disregarded as incompetent. Section 606, Civil Code of Practice; Truitt v. Truitt's Adm'r, 290 Ky. 632, 162 S. W. (2d) 31, 140 A. L. R. 1127. According to other evidence offered to sustain the deed, it was prepared by Conley in his store on June 4, 1928. Coburn called in Ed Hicks and Coet Conley to witness it. The paper was taken by the four men to G. S. Howard, a Notary Public, who lived about 100 yards away, where it was signed by Coburn, by his mark, and acknowledged. The signing was witnessed by Coet Conley, a pardoned convict and the brother of Willis Conley, by Ed Hicks, who later married Conley's sister and whose reputation was attacked, and by Irvie Boyd, then a 13-year old boy who happened to come in, and whose reputation for general morality is bad. The $600 was there paid with $10 bills. The testimony of all these witnesses is so much alike as to minute details as to raise more than a suspicion.

We now consider some of the evidence to the contrary establishing forgery.

Mrs. Howard, widow of the Notary Public, testified

she was at home and was familiar with her husband's transactions, particularly at this time when he was an invalid, and that she did not remember Coburn and these men coming to the house for this or any other acknowledgment. The deed recites as part of the consideration, in addition to one dollar, "the mutual agreement that this deed is not to be recorded until my death." Mrs. Conley testified that her father had never mentioned having conveyed the land to her and that she never saw the deed until two weeks after her father's death.

Conley claimed to have kept the deed in a safe at his home. His storehouse burned in 1932 and his insurance and other papers in the safe were scorched. Witnesses, including the Circuit Judge, testified that in 1940, when the deed involved was first seen by them, it was white and clean and bore no evidence of having gone through a fire as the other papers did. Later it appeared scorched, charred and brittle. Mrs. Conley first testified that when her husband showed her the deed in March, 1940, it "looked very much like the other papers we have that's been in the fire." Later in the course of the trial numerous disinterested witnesses testified that it was unscorched. In accounting for its present condition Conley testified that it had gone through a second fire under these circumstances: He was passing by a wash kettle in his yard and in pushing the wood back under the kettle the deed fell out of his inside coat pocket into the fire and he could not rescue it until it was thus burned. Nobody was present, the washerwoman having gone into the house.

There is a little evidence, of doubtful character, that the form of the deed was put out by a Louisville printer and not adopted or used until after June, 1928, and that at the time this instrument is claimed to have been prepared Howard, the Notary Public, was regularly using a different form. United States documentary revenue stamps upon the deed are said to have been put there when it was written in 1928. It was proved that such stamps had not been required for two and one-half years before that date nor four and a half years afterward.

Mrs. Tonia Mae Baldridge, a stenographer who lived in Prestonsburg and who was disinterested and is doubtless well-known to the special judge who tried the case, testified positively that in 1940 she had typed the deed by filing in the blanks on a printed form, at the

direction of Willis Conley, the date being omitted. Testimony in contradiction is not very persuasive. The original deed is before us. The typing is smooth and regular and of a character that shows an experienced typist wrote it. Conley testified that he had personally typed the deed at Coburn's dictation in his store, and that he had never studied typing. When called upon to write the same names in the presence of the court he spelled several of them differently.

This instrument is endorsed as having been lodged for record "6—19—34." But the certificate of recordation bears the admitted correct date of February 28, 1940, four days after Coburn's death. Both endorsements, however, are in the same handwriting and seem to have been made at the same time by the same pen and ink. R. C. Kilgore, who was for awhile a deputy county clerk, testified that he made the former endorsement and corrected it. There is a cloud of suspicion over this. He had been appointed three days before the 19th of June, 1934, but Pigman, the Clerk, was then personally attending to such matters. The record book of instruments lodged clearly shows the entry of this instrument to have been lodged for record "on 28th day of February, 1940," and that it had been erased and the date "19th day of June, 1934" substituted.

There is very persuasive opinion evidence of several witnesses that the purported signature of G. S. Howard, the Notary Public, is not genuine. Among them are a professional expert and bankers. We have numerous exhibits of true signatures before us for comparison. This one appears to be a careful drawing or tracing, such as an expert witness, Sipple, testified it to be. The widow of the Notary Public testified that after her husband's death in 1939, Willis Conley had bought his notary seal, the imprint of which appears on the deed. He then said he wanted it for a keepsake. However, Conley testified it was broken, one of the plates being gone, and he wanted to have a seal of his own made of it, which he subsequently had done.

The alleged consideration of $600 was inadequate to justify a bona fide purchase and sale, for the gas royalties from the place amounted to $400 a year.

The appellants introduced a witness to testify that in 1938, or early in 1939, Coburn said he was going to

give his home place to his baby, Willis Conley's wife. This, it will be observed, was ten years after the deed is claimed to have been made. Throughout the eleven-and-one-half years intervening between the purported date of the deed and the death of the grantor by which, if genuine, he had conveyed away his home farm to one of his daughters, Coburn treated it as his own and nobody ever heard of the secret deed although the friendliest relations existed between him and the other members of his family. During that time, in 1935, Conley endeavored to buy a small lot off the place upon which to build a chicken house. During that time Coburn made five deeds and contracts involving the land and neither Willis Conley, who was his business agent, nor his wife, Mima Conley, ever questioned them. In December, 1939, he conveyed the home and 50 acres to his wife and although it was included in the 140 acres claimed by the Conleys, they opened not their mouths.

There is other evidence of circumstances, including the attitude of Mrs. Conley and her husband in the course of the trial, which sustains the claim of the appellees that the deed was not executed by A. J. Coburn.

By no means are we to be understood as accepting all of the foregoing as having been conclusively established. There are denials, contradictions, explanations and inconsistencies. There is also affirmative evidence tending to support the genuineness of the deed, including testimony of a handwriting expert. We have considered it all, but to recite this evidence, analyze and set it over against what we have summarized would be of little service and would extend the opinion unnecessarily. The evidence is irreconcilable. Undoubtedly there is falsehood on both sides, some through deliberation and some through failure of memory. There was much incompetent testimony on both sides. The point is that there is strong and persuasive evidence supporting the finding and judgment of the chancellor; and even were we left in doubt we would follow it. Our Reports have many opinions in which the relative merits of various classes of witnesses and testimony are discussed. We need not repeat what has so often been said. Each case is decided upon the particular evidence. The court heard many of the witnesses in person and we concur in his decision that the deed to Mrs. Conley is not genuine.

3. We turn to the consideration of the judgment sus-

taining the deed to the wife of the deceased made two months before A. J. Coburn died. It gave her a part of the home place on which they had lived. The house is divided by the Knott and Floyd County line. The grantor had been in ill health for several months. He had been stricken during the summer with a severe attack of prostate gland trouble and had been in the hospital part of the time. The deed recites the consideration of $1 and "love and affection; also in order to be cared for my life by the party of the second part as long as I live and at my death the foregoing described property is to be paid for and party of the second part is to have full control." The parties themselves testified fully and freely. This testimony of the widow and children and their respective husbands and wives concerning statements and declarations of the deceased grantor and their transactions with him, including their opinions of mental capacity, was incompetent for this is not the contest of a will. Section 606, Civil Code of Practice; Combs v. Roark, 206 Ky. 454, 267 S. W. 210; Pritchard v. Harvey, 272 Ky. 58, 113 S. W. (2d) 865; Martin v. Martin, 286 Ky. 408, 150 S. W. (2d) 696; Truitt v. Truitt's Adm'r, 290 Ky. 632, 162 S. W. (2d) 31, 140 A. L. R. 1127.

Much of the opinion evidence of incapacity is of questionable competency, and part of it must also go out, for it was based upon hypothetical questions evolved from what those disqualified witnesses had testified as to the conduct, statements and condition of the grantor.

Undoubtedly Coburn had become physically weak, somewhat childish, absent-minded and forgetful as to some things. He had become vexed and solicitous about his financial affairs and suspicious of his son-in-law, Willis Conley, who, as we have related, had transacted a good deal of business for him. Some of his particular fears were probably not well-founded, but there is enough reflected to justify some of his apprehensions and to lead one of his age to set his house in order and protect his wife, realizing perhaps that her stepchildren might give her trouble after he was gone. But the evidence does not convince us that the chancellor was wrong in finding him to have been mentally capable of making a deed giving this property to his wife. It must be remembered that it takes less strength of mind for one to give away his property to a natural object of his bounty than it does for one to engage in a transaction involving

power to contract in the business world, or in a man-to-man deal. Schenk v. Schenk, 240 Ky. 237, 41 S. W. (2d) 1102; Schimmelpfennig v. Jungkind, 273 Ky. 182, 115 S. W. (2d) 895. The deputy clerk who took the acknowledgment described the grantor's mental condition and the circumstances and conversations attending the making of the deed in a way and of a character that leads to the belief that he knew exactly what he wanted to do and what he was doing. The same is true as to the neighbors who witnessed his signature, by mark, and to numerous other disinterested witnesses who knew the grantor well. Doctor Collins had known Coburn for more than fifty years and had been his physician for about that long. He described him as a man of strong mind and will up to the time he was stricken after the deed to his wife had been made.

As we have said in relation to the other deed, so here there is evidence of probative force tending to show mental incapacity of the grantor. But this being a matter of fact case and not involving other than familiar rules of law we deem it unnecessary to review all the evidence of the large record on this point or the arguments so ably submitted by the respective attorneys. The trial court's opinion covers the case. It would avail nothing to the parties or to the public for us to do so. There have been many other cases of this kind in which we have been more thoroughly convinced one way or the other. At most we are in doubt and, therefore, we should, as has been often declared, accept the decision of the trial court that the evidence does not prove the grantor was incapable of executing the deed.

Wherefore the judgment is affirmed upon both appeals.